UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MYLINDA BUTLER,                  :
                                 :CIVIL ACTION NO. 3:16-CV-623
            Plaintiff,           :
                                 :(JUDGE CONABOY)
            v.                   :
                                 :
CAROLYN W. COLVIN,               :
Acting Commissioner of           :
Social Security,                 :
                                 :
            Defendant.           :
                                 :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Social Security Income ("SSI") under Title XVI of the Act. (Doc. 1.)  She alleged disability beginning on May 1, 2011. (R. 20.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Jarrod Tranguch, concluded in his April 24, 2014, decision that Plaintiff's severe impairments of a history of multiple back and neck fractures, status post thoracic spine multi-level fusion did not alone or in combination meet or equal the listings. (R. 23.) He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy. (R. 23-29.)  ALJ Tranguch therefore found Plaintiff was not disabled. (R. 30.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded because "[t]he ALJ erred by failing to provide good/specific/supported reasons for discounting the opinions of SSA's examining physician and Plaintiff's primary care physician and nurse practitioner, resulting in an RFC finding that does not properly consider all of Plaintiff's physical limitations." (Doc. 14 at 3.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on October 11, 2012, and for SSI on October 26, 2012.  (R. 20.)  The claims were initially denied on February 11, 2013, and Plaintiff filed a request for a hearing before an ALJ on March 25, 2013.  (*Id.*)

ALJ Tranguch held a hearing on March 19, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Josephine A. Doherty.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on April 24, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 30.)

Plaintiff's request for review of the ALJ's decision was dated June 27, 2014.  (R. 1.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on August 25, 2015.  (R.

2

6-11.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 6.)

On April 14, 2016, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on June 20, 2016.  (Docs. 12, 13.)  Plaintiff filed her supporting brief on August 4, 2016.  (Doc. 14.)  Defendant filed her brief on September 9, 2016.  (Doc. 15.)  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on May 24, 1969, and has a high school education.  (R. 29.)  She has past relevant work as a dental assistant and daycare owner.  (R. 29.)

**1.   Impairment Evidence**

On May 1, 2011, Plaintiff was in an all terrain vehicle ("ATV") accident.  (Doc. 14-1 at 1.)  She sustained numerous injuries, including fractures in her facial bones, neck, and back.  (*Id.*)  On May 4, 2011, Brett Schlifka, D.O., performed surgery on Plaintiff for an unstable T8 burst fracture, compression fractures of T7 and T9, and posterior element fractures.  (R. 265.)

On May 18, 2011, Plaintiff had a post operative visit for suture removal.  (R. 212.)  Office notes indicate Plaintiff was complaining of neck and back pain but said it was tolerable and she

was improving daily.  (*Id.*)  On June 8, 2011, Plaintiff was again seen for follow up.  (R. 221.)  She reported that she was doing well overall but had some neck and back pain that varied in intensity and was improving.  (*Id.*)  She was directed not to do any heavy lifting or excessive activity and to continue Percocet and Flexeril as needed for pain.  (R. 222.)

At her August 2, 2011, office visit, Plaintiff reported that she had been doing well overall, but she complained of occasional headaches and shock-like pains that radiated down her arms into her hands with associated numbness in the fingertips, left greater than right, which had started a few weeks earlier.  (R. 230.)  She also reported that she was not taking anything for pain.  (*Id.*)  Dr. Schlifka recommended MRI to assess nerve roots and discs.  (R. 231.)

MRI of the cervical spine conducted on August 8, 2011, indicated that the C2 fracture and anterior arch of the C1 fracture had healed, the posterior arch fractures were still evident with slight fluid around the area, and there were no other significant abnormalities.  (R. 241.)  A CT scan was recommended to check for callus formation and to see how the posterior arch fractures were healing.  (*Id.*)

At a routine post operative visit on August 17, 2011, Plaintiff continued to complain of intermittent frequent electrical shock-like sensations throughout her entire body but worse

4

throughout her upper body which lasted for seconds but was not painful. (R. 244.) She denied pain or weakness in her upper or lower extremities. (*Id.*) The following Plan was recorded:

> Wean Miami J collar off over next 1-2 wks.[;] Referral to neurology for eval of shck-like sensations offered but pt declines at this time[;] May take baths, hot tubs, and swim; May lift up to 20 pounds and increase 10 pounds/month as tolerated[;] Continue good body mechanics - no deep bending, twisting etc.[;] Continue to not sit bolt upright for greater than 40 minutes, 4 times a day[;] Continue to walk/stairs as tolerated[,] no running jumping, situps, or excessive exercise[;] . . . Medications Given: none[;] Planning for return to work: she may return to work as dental assistant provided she does not lift >20 lbs[;] Will follow-up: 3 months.

(R. 245.)

At her next routine post op visit on December 1, 2011, Plaintiff stated that was feeling well overall and her electric shock symptoms had decreased. (R. 252.) She also noted that she experienced some back discomfort when she sat upright for long periods of time, she had pain in the mid-back that radiated to the left side which was worse since her last visit (3/10 at the time), she had minimal neck pain (only with extreme rotation while driving), and she was not using any pain medications. (R. 252, 258.) Plaintiff reported that she had not yet returned to work because she did not feel she had the stamina. (*Id.*) Plaintiff was directed to continue with activities as tolerated. (R. 253.) She requested that her next follow up visit be scheduled for three

5

months rather than six so that her return to work could be reevaluated. (*Id.*)

On April 26, 2012, Plaintiff again reported that she was feeling well overall but she continued to experience some back discomfort when she sat upright or stood for long periods of time. (R. 432.)  She had minimal neck pain as reported at her previous visit and she was not taking any pain medications. (*Id.*) Plaintiff stated that she had not returned to work but wanted to do so soon. (*Id.*)  Physical examination showed her back was "non-tender," strength was 5/5 in both upper and lower extremities in all phases of motion, sensation was 5/5 in both upper and lower extremities to light touch, reflexes were 2+, and her gait was normal. (*Id.*)  Office notes indicate that Plaintiff was stable and was told that she may continue to have some neck and back discomfort due to her severe injuries. (R. 433.)  Recommendations included that she follow up as needed; have x-rays of the cervical and thoracic spine in one year; lift up to ten pounds and increase ten pounds per month as tolerated; not sit bolt upright for more than forty minutes four times per day; walk and climb stairs as tolerated; and avoid jumping, situps, and excessive exercise. (*Id.*)  Plaintiff said she wanted to return to work and she was given a letter. (*Id.*)  Records indicate she was planning to return to full duty work. (*Id.*)

On January 23, 2013, Plaintiff saw John Citti, M.D., a

consulting examiner, for a disability evaluation.  (R. 547.)
Physical examination showed the following: Plaintiff had
essentially normal range of motion of her neck but pain at the
extremes; her lateral flexion was somewhat limited due to pain; she
was able to bend over toward touching her toes; she was able to
manipulate to get on the examining table but had to be cautious
when trying to get up and down from the lying position; straight
leg raise caused some pull in her mid back; and she could try to
twist her trunk but she could not bend it from side to side.  (R.
549.)  Plaintiff was not taking any pain medications at the time
but occasionally took Advil.  (R. 548.)

    Plaintiff returned to Dr. Schlifka's office on April 11, 2013,
with complaints of upper thoracic spine pain with occasional
radiation to the cervical and lumbar region.  (R. 580.)  Plaintiff
described her back pain as constant and rated it as seven out of
ten at the time of the visit.  (R. 581-82.)  Dr. Schlifka noted
that Plaintiff denied radicular pain and requested that disability
paperwork be completed.  (R. 580.)  He noted that Plaintiff may
need temporary disability.  (R. 581.)  Examination showed mild
tenderness to palpation of the thoracic paraspinal muscles lateral
to incision.  (*Id.*)  Dr. Schlifka prescribed Mobic, Flexeril, and
Lidoderm patch.  (R. 584.)  He referred Plaintiff for pain therapy
and recommended follow up after she had the ordered imaging.  (R.
581, 584.)

After having seen her primary care physician, Michael J. Grasso, M.D., shortly after her accident, Plaintiff returned again on May 3, 2013. (R. 595, 599.) Office notes indicate that Plaintiff had not been in because she had no insurance and had been seeing Dr. Schlifka since 2011. (R. 599.) Plaintiff reported chronic neck and back pain that was controlled to the point she was able to function. (*Id.*) She also reported that she had good and bad days. (*Id.*) Physical examination of the neck showed she had ninety percent range of motion with some pain and stiffness with movement. (R. 600.) Dr. Grasso noted upon musculoskeletal examination that Plaintiff had remarkable functioning in light of her trauma and numbness and pain varied in her limbs and face. (*Id.*) Office notes from Plaintiff's return visit on June 14, 2013, to follow up on her lab results, indicate that her labs "look good." (R. 603.) Plaintiff's complaints and physical examination findings were essentially the same as at her May visit. (R. 603-04.)

Plaintiff next visited Dr. Grasso's office on March 12, 2014, for a routine visit and evaluation for disability. (R. 616.) Office notes set out the following opinion:

> She is in my opinion at her maximum level of funcioning [sic] and or improvement. I do not see how in any way she could continue to be gainfully employed in her profession or any profession for that matter that requires any physical activity and or sitting for periods of longer than 30 minutes to an hour at a time. Her injuries are permanent and

8

> will very likely not improve at all.  Her
> symptoms are actually likely to get worse as
> times goes on due to arthritis and aging.

(*Id.*)  It was also noted that, at the time of the visit, Plaintiff

complained of chronic back and neck pain "which becomes [sic]

almost unbearable" and which required narcotic medications from

time to time and/or lying down for long periods of time.  (*Id.*)

Examination showed that Plaintiff had some mild weakness in her

legs, she was able to move all extremities, numbness and pain

varied in limbs and face from moderate to severe, she displayed

comfort and cooperation when at rest but after ten to fifteen

minutes she became uncomfortable unless she changed positions.

(*Id.*)  It also showed that Plaintiff had some depression due to her

inability to function as she did before the accident but she was

alert and oriented to person, place and time, her recent and remote

memory was intact, her judgment was realistic, and her insight was

appropriate.  (R. 617.)

## 2.   **Opinion Evidence**

In addition to the examination findings set out above, John

Citti, M.D., a consulting examiner, reported the following

impression in his January 23, 2013, Disability Evaluation:

> My impression is the patient is
> fortunate to be alive after C2 and T8
> fracture with compression fractures also of
> adjacent vertebra in the mid thoracic spine
> with Harrington rods in place at this time
> and chronic pain from the above.  She is now
> approximately 20 months since her accident
> and has reached full recovery.  I doubt that

she will be recovering further than where she
is at this time.

(R. 549.)  He opined that Plaintiff could lift or carry two to

three pounds frequently and ten pounds occasionally; she could

stand and walk one to two hours in an eight-hour day; she could sit

for two hours in an eight-hour day; pushing and pulling were

limited in that she could not operate hand controls; she could

occasionally bend and never kneel, stoop, crouch, balance or climb;

her ability to reach was affected by her impairments but her

abilities to handle, finger, feel, see, hear, speak, and

taste/smell were not affected; her continence was not affected; and

Plaintiff had environmental restrictions related to heights, moving

machinery, and temperature extremes.  (R. 551-52.)

On February 6, 2013, a Physical Residual Functional Capacity

Assessment was completed by Jan Kapcala, D.O., a consulting

physician for the State agency.  (R. 83-85.)  Dr. Kapcala made the

following findings: Plaintiff could lift and/or carry tweny pounds

occasionally and ten pounds frequently; she could stand and/or walk

for more than six hours in an eight-hour workday; she could sit for

more than six hours in an eight-hour workday; her ability to push

and pull was unlimited except as shown for lift and/or carry; she

was unlimited in his abilities to climb ramps/stairs, balance,

stoop, kneel, or crouch and could frequently climb

ladders/ropes/scaffolds and crawl; and she had to avoid

concentrated exposure to extreme cold.  (R. 83-84.)  Dr. Kapcala's

explanation for this assessment included the following:  the April 2012 visit to Dr. Schlifka's office where Plaintiff did not have back tenderness, her strength and sensation were 5/5, and she had a normal gait and independent mobility; there was no evidence from treating doctors' examinations that Plaintiff ever developed any nuerologic deficits resulting in weakness or sensory losses, or any major musculoskeletal deficits; Plaintiff's subjectively reported limitations were not really consistent with objective findings; and Dr. Citti's opinion was not supported by other evidence, was an over-estimate of limitations, and the limitations were not consistent with physical findings.  (R. 84-85.)

In April 2013, Dr. Schlifka indicated that Plaintiff presented disability paperwork and noted that she "may need temp disability" but he did not elaborate on this statement.  (R. 581.)

On June 14, 2013, Michael Robatin, CRNP, opined in a Physical Residual Functional Capacity Assessment that Plaintiff could frequently lift and/or carry ten pounds; she could stand and/or walk for less than two hours in an eight-hour day; she could sit for less than about six hours in an eight-hour day; she must periodically alternate between sitting and standing; and she was limited in upper and lower extremities.  (R. 589.)  Mr. Robatin noted that these conclusions were supported by "Fusion T6-10 & T8 Burst Fracture."  (*Id.*)  Regarding postural limitations, Mr. Robatin reported that Plaintiff could never climb ramps, stairs, or

scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl.  (R. 590.)  Support for these limitations was as noted previously and also C1-C2 fractures.  (*Id.*)  For the same reasons, Mr. Robatin found Plaintiff limited in her abilities to reach, handle, finger, and feel.  (R. 591.)  Environmental limitations included the need to avoid concentrated exposure to extreme cold and heat, wetness, and humidity, and avoid all exposure to fumes, odors, dusts, gases, poor ventilation, and hazards.  (R. 592.)  Mr. Robatin also opined that Plaintiff's symptoms were consistent with her injury and are likely permanent.  (R. 593.)

On February 27, 2014, both Mr. Robatin and Dr. Grasso completed another Physical Residual Functional Capacity Assessment, recording the same findings as in the previous form.  (R. 609-14.)

As set out above, on March 12, 2014, Mr. Robatin and Dr. Grasso signed office notes which included the following notation:

> She is in my opinion at her maximum level of funcioning [sic] and or improvement.  I do not see how in any way she could continue to be gainfully employed in her profession or any profession for that matter that requires any physical activity and or sitting for periods of longer than 30 minutes to an hour at a time.  Her injuries are permanent and will very likely not improve at all.  Her symptoms are actually likely to get worse as times goes on due to arthritis and aging.

(R. 616.)

**3.   Testimony**

Plaintiff testified that she tried to go back to work a year

12

after her accident but she left after a couple of days because it was not going well.  (R. 62.)  She then tried volunteering at a summer program at the local high school but that too proved to be too much because she could not stand or sit for long periods of time.  (*Id.*)

Plaintiff testified that she had a lack of treatment after a certain time because Dr. Schlifka said there was nothing else he could do--she was at full functioning capacity and she would keep up with pain management with Dr. Grasso.  (R. 63.)  Plaintiff also said that Dr. Schlifka told her to keep doing the best she could which included sitting and standing for short periods of time and alternating as needed, and avoid situations which aggravated her symptoms.  (*Id.*)  She said it was not good for her to stand or sit for more than an hour at a time and she needed to lie down throughout the day.  (R. 67.)  Plaintiff explained that afer she does something for about an hour, she will lie down for twenty to thirty minutes.  (*Id.*)

At the time of the hearing Plaintiff was primarily taking Advil for pain and also took Meloxicam, Cyclobenzaprine and Tramadol when she "absolutely need[ed] it" which was several times a week.  (R. 64.)  She testified that both cold and humidity affected her symptoms.  (R. 63-64.)  Plaintiff noted that the medications can make her a bit sleepy and they take the edge off the pain.

ALJ Tranguch asked Vocational Expert Josephine Doherty to consider a hypothetical individual of the same age, education, and work experience as Plaintiff with the following abilities/limitations:

> this individual can occasionally lift and carry 20 pounds; frequently lift and carry up to 10 pounds.  This individual can stand and/or walk for up to six hours in an eight hour workday; and can sit for at least six hours.  The individual would need some flexibility with regard to a sit/stand option or need to be able to change positions essentially at will, but would not be off task in performing work duties if she needed to change position.  This individual can occasionally use her upper and lower extremities for pushing and pulling such as operating levels, hand controls, pedals, and foot controls.  This individual can occasionally bend, stoop, crouch, kneel, use ramps and climb stairs; should not perform bending, stooping or crouching on a repetitive basis.  This individual should avoid occupations that require any crawling or climbing on ladders, ropes or scaffolds.  This individual should avoid concentrated exposure to vibration and wet or slippery conditions; and she should avoid workplace hazards such as unprotected heights and dangerous moving machinery.

(R. 72.)   The VE testified that this individual would not be able to perform Plaintiff's past relevant work but there were jobs in the local, state, or national economy that such an individual could perform, including the light duty unskilled positions of information clerk, digital processor, and mail sorter.  (R. 72-73.)

With the added limitation that the hypothetical individual was limited to standing and/or walking for no more than four hours in

an eight-hour workday, the VE stated that the digital processor position would remain.  (R. 73.)  She also identified the sedentary positions of document preparer and charge account clerk.  (*Id.*)

ALJ Tranguch's next hypothetical limited the individual to lifting and carrying no more than ten pounds and standing and/or walking to no more than two hours in an eight-hour workday.  (R. 74.)  The VE stated that the charge account clerk and document preparer positions would remain and she added a ticket counter position.  (*Id.*)

In the final hypothetical, the individual would need to take unscheduled breaks outside the normal breaks, she would need to have the opportunity to change positions frequently and lie down at times during the day which would result in her being off task up to twenty percent of the workday, and she would be expected to be late to work, absent from work, or would have to leave early two or more days per month.  (*Id.*)  The VE responded that this individual would be precluded from competitive employment.  (R. 74-75.)

**4.   ALJ Decision**

As noted above, ALJ Tranguch issued his decision on April 24, 2014.  (R. 20-30.)  He made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since May

15

1, 2011, the alleged onset date (20 CFR
404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe
    impairments: history of multiple back
    and neck fractures, status-post thoracic
    spine multi-level fusion (20 CFR
    404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment
    or combination of impairments that meets
    or medically equals the severity of one
    of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1 (20 CFR
    404.1520(d), 404.1525, 404.1526,
    416.920(d), 416.925 and 416.926).

5.  After careful consideration of the
    entire record, the undersigned finds
    that the claimant has the residual
    functional capacity to perform a range
    of light work as defined in 20 CFR
    404.1567(b) and 416.967(b).  She can
    occasionally lift and carry 20 pounds,
    frequently lift and carry up to 10
    pounds.  She can stand and/or walk no
    more than 4 hours in an 8-hour workday
    and can sit at least 6 hours.  She would
    need some flexibility with regard to a
    sit/stand option.  She would need to
    change positions, essentially at will,
    but would not be off task performing
    work duties if she needed to change
    position.  She can occasionally use her
    upper extremities for pushing and
    pulling, such as operating levers, hand
    controls, pedals, and foot controls.
    She can occasionally bend, stoop,
    crouch, kneel, use ramps, and climb
    stairs, but should not perform bending,
    stooping, or crouching on a repetitive
    basis.  She should avoid occupations
    that require any crawling or climbing on
    ladders, ropes, or scaffolds.  She
    should avoid concentrated exposure to
    vibration and wet or slippery
    conditions, and she should avoid
    workplace hazards, such as unprotected

16

heights and dangerous moving machinery.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 415.965).

7.   The claimant was born on May 24, 1969 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 22-30.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

17

determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); see *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 29-30.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be remanded because "[t]he ALJ erred by failing to provide good/specific/supported reasons for discounting the opinions of SSA's examining physician and Plaintiff's primary care physician and nurse practitioner, resulting in an RFC finding that does not properly consider all of Plaintiff's physical limitations."  (Doc. 14 at 3.)  Plaintiff specifically criticizes the limited weight assigned to the opinions of treating providers Dr. Grasso and Mr. Robatin, and consulting examiner, Dr. Citti.  (Doc. 14 at 8-14.)  Defendant maintains that the ALJ reasonably reconciled the

22

differing medical opinions.  (Doc. 15 at 12.)

It is well established under the regulations and caselaw that the relationship between the claimant and opining physician is an important consideration in the determination of the weight afforded the opinion with more weight generally afforded to the opinion of a source who has examined the claimant than to one who has not.  *See*, *e.g.*, *Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984); 20 C.F.R. § 404.1527(c)(1).  Whether the physician is a specialist is also a relevant consideration in that more weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.  20 C.F.R. § 404.1527(c)(5).

A treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  This principal is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[2]  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of*

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

*Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Similarly, greater deference is due an examining source than a non-examining source.   20 C.F.R. § 404.1527(c)(1).  Section 404.1527(c)(3) provides the following:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

*Id.*

In his review of opinion evidence, ALJ Tranguch first stated that he gave great weight to Dr. Kapcala's February 6, 2013, Physical Residual Functional Capacity Assessment.  (R. 26.)  He concludes that "[t]his consultant's opinions are generally

consistent with the evidence when considered in its entirety, including rather limited follow-up treatment and limited objective findings." (*Id.*)  The ALJ added that he gave Plaintiff "the benefit of the doubt regarding her limitations," and gave additional limitations to those assessed by Kr. Kapcala.  (*Id.*)

ALJ Tranguch assigned moderate weight to limitations noted in Dr. Schlifka's August 2011 and April 2012 office visit records, finding that the limitations were "somewhat supported through objective examination findings at the time each was assessed."  (R. 27.)  He concluded that greater weight should be given to Dr. Schlifka's April 2012 statement that Plaintiff was being released to full duty work without restrictions "as this opinion is more widely supported through essentially routine and benign objective examination findings."  (*Id.*)  He assigned limited weight to Dr. Schlifka's opinion one year later that Plaintiff may need temporary disability because Dr. Schlifka "did not provide a full functional evaluation and his statement is not consistent with rather benign examination findings."  (*Id.*)

ALJ Tranguch assigned limited weight to the opinions of Dr. Grasso and Mr. Robatin dated June 14, 2013, February 27, 2014, and March 12, 2014, and Dr. Citti's January 2013 opinion.  (R. 26-27.)  Regarding Dr. Grasso's and Mr. Robatin's opinions, the ALJ's determination was based on his finding that the limitations noted by these provides "are not well supported by objective findings or

consistent treatment.  The claimant sat for the whole hearing and was able to stand up after the hearing without any hesitancy or difficulty."  (R. 27.)

The rationale provided by ALJ Tranguch for discounting the opinions of Dr. Grasso and Mr. Robatin does not provide the Court with sufficient detail to determine whether his assessment is supported by substantial evidence.   His conclusion that the limitations are not well supported by objective findings or consistent treatment (R. 27) does not explain why the limitations which he acknowledged were found on examination by these providers, including chronic pain (controlled to a point but with good days and bad days), some pain and stiffness with movement of her neck, numbness and pain in her limbs and face which varied from moderate to severe, and mild weakness in her legs (R. 26), did not support the limitations assessed by Dr. Grasso and Mr. Robatin.  ALJ Tranguch's statement that Plaintiff "sat for the whole hearing and was able to stand up after the hearing without any hesitation or difficulty" (R. 27) does not undermine the providers' assessments: Dr. Grasso and Mr. Robatin concluded Plaintiff could sit for less than six hours in an eight-hour day in their RFC assessments (*see*, *e.g.*, R. 610) and noted in March 2014 that she could sit for thirty minutes to an hour (R. 616) and the hearing lasted for approximately thirty-five minutes (R. 54, 76); and the fact that Plaintiff could stand up without apparent difficulty after this

period of time is not shown to be inconsistent with other evidence of record.

ALJ Trunguch assigned limited weight to Dr. Citti's opinion, particularly with regard to lifting, carrying, standing, walking, and sitting, because "his statements are not well supported by objective evidence or consistent with rather normal examination findings.  It appears this examiner's opinions are based largely on the claimant's subjective complaints and self-reported limitations, not actual objective observations."  (R. 27.)  This rationale suffers from deficiencies similar to those discussed in conjunction with the weight assigned to Dr. Grasso's and Mr. Robatin's opinions--Dr. Cicci found physical limitations on examination (R. 549) and the ALJ does not explain why the objective examination findings are not supportive of the limitations assessed.

Furthermore, in a case where all providers and the examiner opined that Plaintiff's serious injuries would result in ongoing symptoms (R. 433, 549, 616), and one year after her surgeon released her for full duty he opined approximately two months after Dr. Cicci's evaluation that she may need temporary disability (R. 433, 581), the ALJ's lack of citation to contradictory examining evidence is noteworthy.  The ALJ's assignment of greater weight to the earlier (March 2012) assessment of Dr. Schlifka (R. 27) is problematic in that each of the examining sources found limitations upon examination (R. 549, 581, 599-600, 616), and the cited records

28

indicate some worsening of Plaintiff's symptoms occurred after she was released to work in April 2012 (R. 432-33).  Similarly, assignment of greater weight to Dr. Kapcala's opinion is problematic because the weight attributed to a nonexamining source should include the consideration of whether the opinion considers all of the pertinent evidence, including opinions of treating sources.  20 C.F.R. § 404.1527(c)(3).  Dr. Kapcala did not consider Dr. Schlifka's opinion in April 2013 that Plaintiff may need temporary disability (R. 581), her reports to Dr. Schlifka of increasing pain (*id.*), and the office notes and opinions of Dr. Grasso and Mr. Robatin (R. 589-93, 599-604, 6609-14, 616).

While there may be a valid basis for the ALJ's assessments of the opinions of Dr. Grasso, Mr. Robatin, and Dr. Cicci, he has not provided such explanations here.  In support of the ALJ's opinion assessments, Defendant emphasizes the limited treatment sought by Plaintiff and limited objective findings.  (Doc. 15 at 16-17.) However, Defendant does not provide a basis for the Court to conclude that the ALJ himself properly assessed the opinion evidence, nor does Defendant demonstrate that substantial evidence supports the ALJ's conclusion that Dr. Schlifka's March 2012 opinion and Dr. Kapcala's February 2013 opinion are entitled to the greater weight attributed.[3]

---

[3]  The Court recognizes the reviewing court may consider ALJ error harmless where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is

Though Defendant now provides significant reasons for discounting the opinions, Defendant cannot do what the ALJ should have done and the *post hoc* rationalization cannot provide substantial evidence for his determinations. *See*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Further, even if the Court were to find merit in Defendant's *post hoc* reasoning, the court should not "'supply a reasoned basis for the agency's action that the agency itself has not given.'" *See*, *e.g.*, *Gross v. Comm'r of Soc. Sec.*, No. 15-2764, ---Fed. App'x---, 2016 WL 3553259, at *4 (3d Cir. June 30, 2016) (quoting *Christ the King Manor, Inc. v. Sec'y of Health & Human Services*, 730 F.3d 291, 305 (3d Cir. 2013)). Therefore, although the record is thin and the Court does not assess matters left to the Commissioner, this case must be remanded for further consideration of the opinion evidence and the establishment of a properly supported RFC assessment.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration. An appropriate Order is

---

supported by substantial evidence. *See*, *e.g.*, *Albury*, 116 F. App'x at 330. The Court does not pursue this consideration here primarily because Defendant did not do so. As noted in the text, Defendant essentially argues that the ALJ properly assessed the medical opinions. (Doc. 15 at 11-24.) Furthermore, harmless error is not clearly evident here given the considerations discussed in the analysis of ALJ Tranguch's assessments of the medical opinions at issue.

filed simultaneously with this action.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: October 11, 2016